734 F.2d 1129
 15 Fed. R. Evid. Serv. 531
 UNITED STATES of America, Plaintiff-Appellee,
v.
James A. WHITLEY (83-5428), James P. Wagers (83-5438),
Matthew Foley (83-5439), William Shelton a/k/a
Douglas Harrison (83-5440), Joseph L.
Hucks (83-5456), Defendants-Appellants.
 Nos. 83-5428, 83-5438, 83-5439, 83-5440 and 83-5456.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 17, 1984.
Decided May 2, 1984.
 
 Richard Hay, Somerset, Ky. (court-appointed), for Whitley.
 David O. Smith, Corbin, Ky. (court-appointed), for Wagers.
 Gary Crabtree, London, Ky., for Foley.
 Warren N. Scoville (argued), Lewis, Scoville, Scoville & Stansbury, London, Ky., for Shelton.
 Brian C. House, London, Ky. (court-appointed), for Hucks.
 Louis DeFalaise, U.S. Atty., James Zerhusen, Asst. U.S. Atty. (argued), Lexington, Ky., for plaintiff-appellee.
 Before KEITH, MERRITT and WELLFORD, Circuit Judges.
 KEITH, Circuit Judge.
 
 
 1
 The appellants, James A. Whitley, Joseph L. Hucks, James P. Wagers, Matthew Foley and Douglas Harrison, were indicted by a grand jury on December 14, 1982 on two counts. Count I charged that the appellants knowingly and wilfully agreed, confederated and conspired with one another, and others unknown to the Grand Jury, to commit offenses against the United States in violation of 21 U.S.C. Sec. 841(a)(1),[1] and knowingly and intentionally distributed, and possessed with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 846[2]. Count II charged that appellants, aided and abetted by one another, knowingly and intentionally did unlawfully distribute and possess with intent to distribute cocaine, a Schedule II Controlled Substance, in violation of 18 U.S.C. Sec. 2,[3] and 21 U.S.C. Sec. 841(a)(1).
 
 
 2
 A jury trial was held, and on April 28, 1983, the jury found the appellants guilty on both counts. The appellants were sentenced as follows: Whitley--six years imprisonment on Count I, and six years on Count II, to be served concurrently; Hucks--six years imprisonment on Count I, and six years imprisonment and a fine of $2,000 on Count II, with the sentences to be served concurrently; Wagers--five years imprisonment on Count I and five years on Count II, to be followed by a special parole term of three years, with sentences served concurrently; and Harrison--eight years imprisonment on Count II, with the sentence to be served concurrently. For the reasons stated below, we affirm.
 
 I.
 Facts
 
 3
 On December 2, 1982, an informant named "Bob" introduced Clifford Best, a Drug Enforcement Administration (DEA) agent, to appellant James Whitley and to Bradley Barkas[4] at a restaurant in Lexington, Kentucky. Best was introduced as a "man who had money and was interested in buying a high quality brand of cocaine." During this meeting, Best made arrangements with Whitley to purchase a pound of cocaine. At the conclusion of the negotiations, Best gave Whitley $150 as good faith money.
 
 
 4
 On December 6, 1982, Whitley called Best and suggested that Best come to Lexington, Kentucky to meet with him and several other people. Best went to Lexington, accompanied by Tommy Whitehead, an undercover officer of the Louisville police department. He also took $20,000 with which to purchase the cocaine. He met Whitley at his apartment, along with appellants Foley and Wagers. Wagers told Agent Best that the drug transaction would occur at the Holiday Inn in Corbin, Kentucky, on the following night at 8 p.m. He also stated that the cocaine would cost $2,500 per ounce.
 
 
 5
 Also, during this meeting, Whitley and Wagers had a short discussion to determine who would check the "buy" money. They decided that Wagers would accompany Best to the parking lot where Detective Whitehead had the money. At the car, Whitehead gave Best a white satchel which contained four packets. Each packet consisted of $5000 in $100 bills. Wagers looked through the satchel and counted out one packet. On their return to the apartment, Whitley instructed Best to pick him up the next night to go to Corbin, Kentucky.
 
 
 6
 On December 7, 1982, at approximately 8 p.m., Agent Best and Detective Whitehead picked up Whitley at his apartment and drove to Corbin, Kentucky. During the trip, Whitley told Best that he wanted $2,000 and a quarter ounce of cocaine for his help in the transaction. He also stated that he had to split his part with his "man from Corbin." After Best and Whitehead left Whitley's apartment, other police officers, who were conducting surveillance, saw approximately four or five people exit from the apartment and enter a green Cadillac.
 
 
 7
 When they arrived at the hotel Whitley made another call to "his man from Corbin" to tell him of their arrival and the room number (Room 130). At approximately 10 p.m., Wagers and Foley came to Whitley and Best's room. Agent Best showed them the "buy money" and Wagers produced a small sample of cocaine. Best performed a Chlorox bleach test and a water test on the cocaine, and then rejected it.[5] Wagers and Foley then left with the sample. Approximately fifteen minutes later, Wagers and Foley then returned with another sample which Best tested, and found acceptable. Best and Wagers then discussed how the transaction was going to take place. Best then gave Wagers $500 in "good faith money".
 
 
 8
 After the negotiations with Best, Wagers again left to talk with "his man". When he returned, he gave the $500 back to Best and said "his man" was not satisfied with the plans made to complete the deal. Wagers then telephoned and talked to "the man". Best also talked to "the man" on the phone, and arranged to have that person deliver the cocaine to him at another room at the hotel. Agent Best and Wagers then left Best's room and went to Room 242. Whitley and Foley also left, while Whitehead remained in the room with the money.
 
 
 9
 At Room 242 they met Douglas Harrison, a.k.a. William Shelton. In Harrison's room, Best and Harrison agreed on a price, then Harrison went to the window and gave a signal for the cocaine to be brought to him. A few minutes later, someone came to the door (allegedly appellant Hucks) and handed Harrison a purple "Royal Crown" bag which contained cocaine. A police officer, who had been conducting surveillance with other officers, identified appellant Hucks as the person seen around Harrison's room at the time the cocaine was handed to Harrison.
 
 
 10
 Best again tested the cocaine, which he found to be of acceptable quality. Agent Best then called Detective Whitehead to bring the money, which was the signal to make the arrests. Detective Whitehead arrived at Room 242 with the money and, once inside, both he and Agent Best placed appellants Wagers and Harrison under arrest. Harrison attempted to escape by jumping through a sliding glass door. However he did not make it completely through the door, and the glass shattered, making a loud noise. Immediately afterwards, evidently having heard the noise, appellant Hucks sped from the parking lot in a blue Cadillac. He was pursued by police, shots were fired, and he eventually ran off the road. Hucks was later apprehended in a culvert near the blue Cadillac.
 
 
 11
 Another vehicle, a green Cadillac, occupied by Whitley, Foley and James Davis, also started out of the Holiday Inn parking lot. This vehicle was also pursued, and was stopped about three-tenths of a mile from the entrance to the Holiday Inn. When FBI agents got to the vehicle, Whitley and Davis were sitting in the back seat of the car. The person in the front seat, Foley, escaped, but later turned himself in.
 
 II.
 Issues
 A. Post-Miranda Silence
 
 12
 The appellants assert that it was reversible error for evidence to be presented at trial concerning Wagers' post-arrest, post-Miranda silence. We find this assertion to be unpersuasive.
 
 
 13
 During direct examination of Agent Best by Prosecutor Zerhusen, the following transpired:
 
 
 14
 Q. At the time that you arrested Mr. Harrison on the late hours of December 7, 1983, did you advise him of his so-called Miranda rights?
 
 
 15
 A. Yes, I did.
 
 
 16
 Q. Would you tell the jury exactly what you advised Mr. Harrison?A. He knew that I was a Federal agent, and I told him that I had to explain his rights against self-incrimination to him. The first thing I told him, and Wagers together, was that they had the right to remain silent. And I explained to them that they didn't have to say anything to us if they didn't want to. And I asked them if they understood that, and they said that they did, each one of them. And I told them that anything they said could be used against them in court. I explained to them that if they told me A, B, C, that I could go to court and repeat A, B, C, to a judge or jury. I asked them if they understood that, and they said they did.
 
 
 17
 I told them they had the right to an attorney, which meant a lawyer, and if they couldn't afford an attorney, that one would be appointed for them at no expense. And I asked them if they understood that, and both of them said that they did.
 
 
 18
 And I asked--I told them that as part of their rights that if we wanted to question them about anything, they had the right to stop questioning or stop answering the questions and request an attorney be present, and once again, each of them said that they understood that.
 
 
 19
 Q. And again, who were you present with?
 
 
 20
 A. It was with Wagers and Harrison and FBI Agent Keller.
 
 
 21
 Q. And did you speak with Mr. Harrison during this time?
 
 
 22
 A. Well, we had--he asked--I asked him a couple of questions about his personal history, such as his name and where he was from, and he asked me a couple of questions.
 
 
 23
 Q. What did he tell you about his name and where he was from?
 
 
 24
 At this point, objections and motions by various defense counsels were made, including those by counsel for defendant Wagers as follows:
 
 
 25
 Mr. Smith: If we could just have one more minute of the Court's time.
 
 
 26
 The Court: Okay.
 
 
 27
 Mr. Smith: Your honor, since Mr. Zirhusen has had the witness testify that Mr. Wagers was read his rights, it is my recollection from what I have been furnished, I was given no statements, post-arrest statements. Is he going to testify about what Mr. Wagers said?
 
 
 28
 (Counselor Zirhusen nods in the negative.)
 
 
 29
 Mr. Smith: I believe that this is a comment on Mr. Wagers' silence after he was read his rights, and I think that this is error in this matter.
 
 
 30
 Mr. Zirhusen: There was no comment regarding anything he said or did not say anything.
 
 
 31
 Mr. Smith: It is a direct comment on his silence because the jury is expecting to hear what Mr. Wagers said. And, if they put nothing on that he said, that is a direct comment on his silence after he was read his rights.
 
 
 32
 The Court: Well, it probably shouldn't have been brought up since the two were there together. If you want me to tell the jury that Mr. Wagers was not required to make a statement, I will, but if you don't want me to, I won't say anything.
 
 
 33
 Wagers contends that the testimony of Agent Best, on direct examination by the government, constituted an impermissible reference to his right to remain silent. He bases this assertion on the fact that after he and co-defendant Harrison were arrested and given their rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Harrison inquired as to the type and length of sentence he would receive. Wagers remained silent after his Miranda rights were given. In making this assertion, Wagers relies on Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In Doyle, the Supreme Court established that it is a violation of a defendant's due process rights to allow his silence at the time of arrest and after he has received his Miranda warning to be used to impeach an exculpatory story given for the first time at trial. Id. at 617-18, 96 S.Ct. at 2244-45. In cases decided pursuant to Doyle, the courts have uniformly condemned even indirect reference to a defendant's post-arrest silence. United States v. Shaw, 701 F.2d 367, 381 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984); United States v. Johnson, 558 F.2d 1225 (5th Cir.1977); United States v. Wycoff, 545 F.2d 679 (9th Cir.1976), cert. denied, 429 U.S. 1105, 97 S.Ct. 1135, 51 L.Ed.2d 556 (1977).
 
 
 34
 However, testimony on direct examination by a government witness that a defendant had been given the Miranda rights, followed by neither questions as to what defendant said nor by testimony concerning that defendant's failure to make statements after the giving of said rights, does not constitute improper comment upon that defendant's right to remain silent. United States v. Jonas, 639 F.2d 200, 205 (5th Cir.1981); United States v. Warren, 578 F.2d 1058, 1073 (5th Cir.), cert. denied, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). As in the present case, the issue in Jonas and Warren, was the question of improper comment on the right of silence. In Jonas and Warren, the government witness gave a narrative of the arrest process and described the giving or lack of responses by the defendants. The Fifth Circuit stated in Jonas that:
 
 
 35
 Appellant's contention regarding this issue was answered by this Court in United States v. Warren, supra, 578 F.2d at 1072-73. There, this Court held that admission of testimony that the defendants were advised at the time of their arrest of their right to remain silent did not constitute a comment on the exercise of the defendants' right to remain silent and thus reversal was not required. No reversal is required in this case.
 
 
 36
 639 F.2d at 205.
 
 
 37
 We find that the facts of this case do not evince a violation of appellant's due process rights pursuant to Doyle. Agent Best testified only to the questions that were directed to him by appellant Harrison. In this testimony, he made no reference, explicit or implicit, as to the silence of appellant Wagers. Furthermore, the government did not raise the fact of Wagers' post-arrest silence by questions, other testimony, or comment in the argument. In fact, Wagers makes no allegation that the government in any manner referred to, followed up on, or emphasized Best's testimony. Moreover, if this testimony was so egregious that it constituted major prejudice, counsel for appellant should have requested that a curative instruction be given to the jury. However, no such curative instruction was requested. The record clearly evinces that the trial court offered to make such an instruction. The failure of appellant's counsel to pursue such an instruction is anathema to the validity of this assertion. We, therefore, conclude that there was no improper reference to appellant's post-Miranda silence by the prosecutor or Agent Best's testimony.
 
 
 38
 Appellant Hucks also asserts that his Fifth Amendment right to remain silent was violated by Agent Best's comments regarding his post-arrest silence. This assertion cannot be substantiated.
 
 
 39
 During cross-examination of Agent Best by Warren Scoville, counsel for co-defendant Harrison, the following transpired:
 
 
 40
 Q. What kind of investigation did you conduct to find the person who got away that night, that you were told that got away, that delivered the cocaine?
 
 
 41
 A. I don't believe there is any other person, so there was no investigation.
 
 
 42
 Q. You didn't conduct any investigation?
 
 
 43
 A. I know of nothing to look into unless Mr. Hucks had wanted to tell me something that I could look into.
 
 
 44
 As a result of the preceding testimony, Hucks moved for a mistrial, which was denied by the court. The court then admonished the jury to disregard this portion of Agent Best's testimony.
 
 
 45
 Hucks contends that this testimony constituted an improper comment on his right to remain silent after his arrest. However, a curative instruction was made immediately by the trial judge. He sustained an objection by appellant's counsel, but denied the motion for a mistrial. He noted that:
 
 
 46
 The Court: I don't think we have a comment on the silence of a party, because what we have here is much different. The first thing that was brought up about Hucks even making a statement was brought up by his counsel, Mr. House. The second thing that was brought up about Mr. Huck's statement was by counsel for Mr. Harrison. Now it is different to say that Mr. Hucks wouldn't tell me anything. What we have here is Mr. Hucks tells the agent, and the first time it is brought out is when Mr. House and Mr. Scoville brought it out primarily, that there was another individual involved, but he couldn't give him a name. That is a whole lot different from saying Mr. Hucks wouldn't say anything. But Mr. Hucks did say something, and when he came forward to say that he had a--he knew there was a mysterious party there, to quote an old movie theme, it was the Third Man Theme, that there was some other mysterious person that was lurking in the woods, that is not a comment on his silence.
 
 
 47
 Mr. House: Your Honor, I believe--
 
 
 48
 The Court: Because he never did say, I'm using Miranda rights or I don't want to give you the name, he just said he didn't have a name or something of that nature.
 
 
 49
 Mr. House: Your Honor, I believe what Agent Best said on the stand was he did not have any basis for investigation unless Hucks wanted to tell him something. That implies knowledge retained by silence, and that is a direct comment on Mr. Hucks' Miranda rights. And it tells the jury that he is holding something back. And that was not the import of Hucks' statement at all.
 
 
 50
 The Court: Well, when he, Hucks, said there was a central figure or a main cog or whatever it was, those were his words, but he was pointing at somebody besides him that did it, but he couldn't identify him, I think that was (sic) what the agent said, especially in that--
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 The Court: Well, I will give the admonition, I don't think it is a comment upon his silence, but I will give the admonition to disregard the statement Mr. Best made that Mr. Hucks didn't provide any--he didn't come forward with any names, if that's what you want.
 
 
 54
 * * *
 
 
 55
 * * *
 
 
 56
 Thank you, Your Honor.
 
 
 57
 (In open court.)
 
 
 58
 The Court: All right. The jury will disregard the one statement Agent Best made that Mr. Hucks didn't come forward with any name or identification of this other party.
 
 
 59
 The common theme which exists in the cases where there has been an impermissible reference to a defendant's silence is that the post-Miranda reference was made by the prosecution. See United States v. Doyle, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); United States v. Williams, 665 F.2d 107 (6th Cir.1981); United States v. Johnson, 558 F.2d 1225 (5th Cir.1977). In the present case, the testimony was not elicited by questions from the government, but rather by questions propounded by counsel for codefendant.
 
 
 60
 Although decided on different grounds,[6] United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), provided the theoretical base regarding inquiry by the government into post-arrest silence of a defendant. Justice Douglas stated in his concurring opinion with the majority that:
 
 
 61
 I also believe ... that given the existence of Miranda, due process is violated when the prosecution calls attention to the silence of the accused at the time of arrest.
 
 
 62
 422 U.S. at 182, 95 S.Ct. at 2139.
 
 
 63
 In both Hale and Doyle, the inquiry involved cross-examination by the government of a defendant concerning post-arrest silence in the impeachment context. These facts are clearly distinguishable from the case at bar. Moreover, the aspect of the condemned inquiry that makes it reversible error is the prosecution's emphasis on the defendant's post-arrest silence in an effort to imply a consciousness of guilt. The Court in Doyle noted that:
 
 
 64
 [t]he error we perceive lies in the cross-examination on [post-arrest silence], thereby implying an inconsistency that the jury might construe as evidence of guilt ... the unfairness occurs when the prosecution in the presence of the jury, is allowed to undertake impeachment on the basis of what may be the exercise of that right [to remain silent].
 
 
 65
 426 U.S. at 618 n. 10, 96 S.Ct. at 2245 n. 10.
 
 
 66
 The conduct condemned in Hale, and its progeny, simply did not occur in the instant case. Here, the question posed was not posed by the government, but rather by counsel for co-defendant. There also was no allegation that the government in any manner attempted to emphasize, highlight, refer to, or utilize the testimony elicited by co-defendant's counsel. There are no grounds to support the appellant's assertion, and accordingly we find that the district court did not err in denying the motion for mistrial.
 
 
 67
 B. Disclosure of Informant Identity.
 
 
 68
 Appellant Whitley asserts that the trial court improperly allowed the United States to protect the identity of its informant. We disagree.
 
 
 69
 The Supreme Court has recognized that the government has a privilege not to disclose the identity of persons who furnish information regarding violations of law. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Scher v. United States, 305 U.S. 251, 254, 59 S.Ct. 174, 176, 83 L.Ed. 151 (1938). The purpose of this privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials, and by preserving their anonymity, encourages them to perform that obligation. Roviaro, 353 U.S. at 59, 77 S.Ct. at 627. However, this "privilege is limited where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause...." Id. at 60, 77 S.Ct. at 623.
 
 
 70
 In Roviaro, an informant participated in the apprehension of a drug dealer. The informant picked up Roviaro and took him to a pre-arranged location where a small box had been left at the base of a tree. Roviaro placed the box in the informant's car, and then walked away from the car. When police officers opened the box, it was found to contain three glassine envelopes containing white powder which was subsequently identified as heroin. At trial, the district court did not require the disclosure of the informant's identity. The Court of Appeals for the Seventh Circuit sustained the conviction, holding that the trial court had not abused its discretion in denying petitioner's request for disclosure of the informant's identity. Roviaro, 353 U.S. at 57, 77 S.Ct. at 626. The Supreme Court granted certiorari, 351 U.S. 936, 76 S.Ct. 834, 100 L.Ed. 1464, and found that the informant's identity should have been disclosed, because his testimony was highly relevant to the defense. It based this decision on the fact that the informant had a material role in the petitioner's acquisition of the drugs, that the informant was the sole person present with the petitioner at the occurrence of the crime, and that the informant might have been a material witness as to whether the petitioner knowingly transported the drugs as charged. Id. 353 U.S. at 55-56, 77 S.Ct. at 624-626.
 
 
 71
 However, in reversing the Court of Appeals, the Supreme Court declined to establish a fixed rule with respect to disclosure of an informant's identity. Instead, it indicated that the "problem is one that calls for the balancing of the public interest in protecting the flow of information against the individual's right to prepare his defense." Id. at 62, 77 S.Ct. at 629. It further stated that "whether a proper balance renders non-disclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." Id. at 62, 77 S.Ct. at 629.
 
 
 72
 In the instant case, the record indicates that the informant, Bob, was not a major participant in the drug transaction. His role was that of merely introducing Agent Best to appellant Whitley. He was not involved in any other phase of the price negotiations or discussions regarding the drugs. Nor was he present when the actual drug transaction occurred at the Holiday Inn. This very limited involvement in the transactions of this case is inconsistent with the role played by the informant in Roviaro.
 
 
 73
 This Court has required disclosure of an informant's identity when the informer was an eyewitness to, and in fact a participant in, the exchange of contraband by the defendant seller. See United States v. Barnett, 418 F.2d 309 (6th Cir.1969); United States v. Lloyd, 400 F.2d 414 (6th Cir.1968). However, this Court has found non-disclosure proper when the informer, like "Bob", was not a participant in the drug transactions. United States v. McManus, 560 F.2d 747, 751 (6th Cir.1977), cert. denied, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978). In United States v. Lloyd, 400 F.2d 414 (6th Cir.1968) this Court made the following applicable finding:
 
 
 74
 The privilege of the Government to withhold the identity of informers is especially important in the enforcement of narcotic laws. In the illegal sale of narcotics there is usually no complaining witness. The transaction is always consensual; only the pusher and the buyer are involved. The Government must of necessity rely on informers, and an informer is effective only so long as his identity is not known. A court is reluctant, therefore, to require that an informer's identity be revealed.
 
 
 75
 400 F.2d at 415.
 
 
 76
 Based on the facts of the instant case, we find that the privilege of non-disclosure is balanced in favor of the government. The identity of the informant was not "relevant and helpful to the defense" or "essential to a fair determination of the cause." Therefore, we find that the district court properly denied the motion for disclosure.
 
 
 77
 Whitley contends that although "Bob" did not participate in the drug transaction, he allegedly played a role in the conspiracy. This contention cannot stand after close scrutiny of the facts in this case. After the first meeting with Agent Best, Whitley planned the transaction which eventually led to his conviction. This plan was made without the participation of the informant. Whitley and Best had numerous telephone conversations about the drug deal, beginning the day after their first meeting. Whitley gave Best two pay telephone numbers that were used to set up the transaction. Moreover, Whitley initiated the meeting between Best and defendants Wagers and Foley at Whitley's apartment. Thus, Whitley's conspiracy with the other defendants did not begin until after "Bob" was totally uninvolved. Similarly, in United States v. Jackson, 422 F.2d 975 (6th Cir.1970), the informant had led the government agent to a meeting with a defendant who was later charged with conspiracy and possessing stolen property. This Court upheld the informer's privilege, finding that disclosure was not essential to a fair determination of the charges. 422 F.2d at 977.
 
 
 78
 Whitley also argues that disclosure was necessary for him to establish an entrapment defense. Regardless of whether the informant's identity was disclosed, however, Whitley did not demonstrate any of the other requirements for the entrapment defense. Whitley did not testify, admit the acts or present any evidence whatsoever. To rely on the defense of entrapment, the defendant must admit all elements of the offense. United States v. Bryant, 716 F.2d 1091 at --- (6th Cir., 1983); United States v. Mitchell, 514 F.2d 758, 761 (6th Cir.), cert. denied, 423 U.S. 847, 96 S.Ct. 86, 46 L.Ed.2d 68 (1975); United States v. Lamonge, 458 F.2d 197, 201 (6th Cir.), cert. denied, 409 U.S. 863, 93 S.Ct. 153, 34 L.Ed.2d 110 (1972). Furthermore, this Court has noted that the "[m]ere fact that the Government informant ... on various occasions attempted to arrange the purchase of narcotics from [defendant] does not establish the defense of entrapment as a matter of law." United States v. Henciar, 568 F.2d 489, 491 (6th Cir.1977), cert. denied, 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978).
 
 C. Severance Motion
 
 79
 Appellant Harrison asserts that he was denied a fair trial because the trial court denied his motion for severance from the other appellants. He alleges he was denied the use of co-defendant Wagers as a witness. This assertion is without merit.
 
 
 80
 Fed.R.Crim.P. 8(b) provides that joinder of defendants is permissible if they are alleged to have participated "in the same series of acts or transactions constituting an offense or offenses." It is well settled that joinder is proper under Rule 8(b) where an indictment, as in this case, charges multiple defendants with participation in a single conspiracy. United States v. Warner, 690 F.2d 545, 551 (6th Cir.1982); United States v. Goble, 512 F.2d 458, 465-66 (6th Cir.), cert. denied, 423 U.S. 914, 96 S.Ct. 221, 46 L.Ed.2d 143 (1975). Rule 8(b) is designed to promote judicial economy and efficiency by avoiding multiple trials. Bruton v. United States, 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620, 1625 n. 6, 20 L.Ed.2d 476 (1968).
 
 
 81
 During trial appellant Harrison made a motion for severance pursuant to Fed.R.Crim.P. 14. The district court denied this motion because it was too "speculative" as to the content of Wager's testimony. The Supreme Court has fully recognized that the decision of whether to order separate trials is a matter within the sound discretion of the trial court judge. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); United States v. Jackson, 409 F.2d 8, 9 (6th Cir.1969). Furthermore, this Court has held that a district court's denial of a motion for severance should not be reversed unless there is a clear showing of abuse of discretion. See United States v. Goldfarb, 643 F.2d 422, 434 (6th Cir.), cert. denied, 454 U.S. 827, 102 S.Ct. 117, 70 L.Ed.2d 101 (1981).
 
 
 82
 Harrison has the "heavy burden" of showing abuse of discretion in the denial of his motion for severance. Goldfarb, 643 F.2d at 435. As noted by the Ninth Circuit, "[t]he 'great mass' of cases refuse to grant a severance despite [any] anticipated exculpatory testimony of a co-defendant." United States v. Gay, 567 F.2d 916, 919 (9th Cir.), cert. denied, 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 90 (1978). To justify a separate trial, Harrison must make a showing that Wagers would be willing to testify in his behalf. This would require a showing that Wagers would not invoke his Fifth Amendment privilege, and that the testimony would be exculpatory. Goldfarb, 643 F.2d at 435. Appellant Harrison has failed to make a showing that Wagers would be willing to testify on his behalf, and that such testimony would be exculpatory. There also was no showing that in separate trials any defendant would waive his Fifth Amendment privilege. This matter was addressed entirely to the sound discretion of the district court, and we find no abuse of this discretion. Appellant Harrison had a heavy burden to sustain, which he failed to do. Therefore, we find that the district court properly denied the motion for severance.
 
 D. Classification of Cocaine
 
 83
 Appellants Whitley, Wagers, Foley, and Harrison assert that the classification of cocaine as a narcotic drug is a denial of equal protection. We find that this commonly asserted proposition is totally without merit.
 
 
 84
 A brief history of cocaine is relevant to the disposition of this issue. Cocaine is a naturally occurring stimulant drug produced from the leaves of the coca bush. The primary source of cocaine is Erythroxylum coca, which is a species of flowering plant indigenous to the western hemisphere. The coca plant's natural environment is the hot, humid eastern slope of the Andes mountains. It grows principally in Bolivia, Chile and Peru, but also can be found in Colombia and Venezuela.[7]
 
 
 85
 Cocaine is an alkaloid which must be extracted from coca.[8] It was first successfully isolated and extracted in the 1880's and was used as a local anesthetic in eye, nose, and throat surgery because it constricted blood vessels, thereby limiting bleeding in surgery. It also became an ingredient in several patent medicine cure-alls.[9] Because of its toxicity cocaine is no longer injected into the skin for medicinal purposes. Its use as an anesthetic in eye surgery has also diminished because it can cause damage to the cornea and excessive dilation of the pupils.
 
 
 86
 It is undisputed that cocaine is not a narcotic under the pharmacological definition of the term. The term "narcotic" is derived from the Greek word for numbness or stupor.[10] Narcotics are central nervous system depressants which create a physical dependence in the user. Narcotic use is characterized by tolerance and the need for increasing doses over a length of time to maintain the same pharmacological effects. Withdrawal is also a major factor when use of the drug is discontinued.[11]
 
 
 87
 The chemical structure of cocaine is unlike that of narcotics, and it is not associated with a tolerance or withdrawal syndrome. In contrast to narcotics, cocaine is a stimulant. It produces euphoria, a sense of intense stimulation, and of psychic and physical well-being. The non-medical use of cocaine occurs primarily by inhaling or "snorting" through the nose. A less common method of use is intravenous injection into the blood stream.[12]
 
 
 88
 It was the increasing non-medical use and potential for abuse of drugs which led Congress to conduct a series of hearings in the late 1960's. From these hearings it determined that the abuse of cocaine and other drugs posed a serious threat to the health and welfare of the country. As a result, Congress enacted the Comprehensive Drug Control and Prevention Act of 1970, 21 U.S.C. Sec. 801 et seq. The stated purpose of the Act was to deal with the growing menace of drug abuse in the United States. The Act, through its regulations, was to: 1) provide authority for increased efforts in drug abuse prevention and rehabilitation of users; 2) provide more effective means for law enforcement aspects of drug abuse prevention and control; and 3) provide for an overall balanced scheme of criminal penalties for offenses involving drugs. H.R.Rep. No. 91-1444, 91st Cong., 2nd Sess. 3, reprinted in 1970 U.S.Code Cong. & Ad.News 4566, 4567.
 
 
 89
 An integral part of this legislation was the identification and classification of drugs which were abused, or had the potential for abuse, into schedules of controlled substances. In classifying these controlled substances Congress defined a "narcotic drug" as:
 
 
 90
 (16) [a]ny of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:
 
 
 91
 (A) Opium, coca leaves, and opiates.
 
 
 92
 (B) A compound, manufacture, salt, derivative, or preparation of opium, coca leaves, or opiates.
 
 
 93
 (C) A substance (and any compound, manufacture, salt, derivative, or preparation thereof) which is chemically identical with any of the substances referred to in clause (A) or (B).
 
 
 94
 21 U.S.C. Sec. 802(16).
 
 
 95
 As a narcotic drug, cocaine was classified pursuant to Schedule II, 21 U.S.C. Sec. 812, which provides that:
 
 
 96
 (A) The drug or other substance has a high potential for abuse.
 
 
 97
 (B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.
 
 
 98
 (C) Abuse of the drug or other substances may lead to severe psychological or physical dependence.
 
 
 99
 Cocaine is pharmacologically classified as a non-narcotic, central nervous system stimulant. However, it is a chemical derivative of coca leaves, and as such comes within the regulatory definition of narcotic drug as enunciated by Congress in 21 U.S.C. Sec. 802(16) and 21 U.S.C. Sec. 812. It is clearly within Congress' prerogative to classify cocaine as a narcotic for penalty and regulatory purposes. United States v. Stieren, 608 F.2d 1135, 1136 (8th Cir.1979). It is well-settled that such a classification of cocaine as a Schedule II Controlled Substance is not a constitutional violation. United States v. Kolenda, 697 F.2d 149, 150 (6th Cir.1983); United States v. Vila, 599 F.2d 21, 25 (2d Cir.), cert. denied, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); Government of Canal Zone v. Davis, 592 F.2d 887, 890 (5th Cir.1979); United States v. Szycher, 585 F.2d 443, 444-45 (10th Cir.1978). As the Supreme Court noted in Marshall v. United States, 414 U.S. 417, 428, 94 S.Ct. 700, 707, 38 L.Ed.2d 618 (1974), "legislative classifications need not be perfect or ideal." It further noted that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices." Id. at 427, 94 S.Ct. at 706.
 
 
 100
 Our inquiry is limited to the question of whether a classification or refusal to reclassify cocaine is irrational or unreasonable. We find that it is not. In promulgating a comprehensive drug abuse and prevention program, Congress recognized that "controlled substances have a substantial and detrimental effect on the health and general welfare, and elected to classify cocaine as a narcotic--". United States v. Alexander, 673 F.2d 287, 288 (9th Cir.), cert. denied, 459 U.S. 876, 103 S.Ct. 168, 74 L.Ed.2d 139 (1982). We find that in light of the goals of the Act, and the widespread abuse of cocaine, this legislative classification is neither irrational nor unreasonable. This classification is proper for the stated Congressional purposes regardless of cocaine's proper pharmacological classification. United States v. Lustig, 555 F.2d 737, 750 (9th Cir.), cert. denied, 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977); United States v. Harper, 530 F.2d 828 (9th Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).
 
 
 101
 In the instant case, the government established by expert testimony that the substance retrieved during the arrest of the appellants was cocaine. In fact, the district judge took judicial notice that cocaine was a derivative of, or made from coca leaves. It is beyond peradventure that it is proper for a district court to judicially notice the fact that cocaine is derived from coca leaves and is therefore a controlled substance. United States v. Berrojo, 628 F.2d 368, 369 (5th Cir.1980); United States v. Gould, 536 F.2d 216 (8th Cir.1976). The Act permits the Attorney General to exercise his discretion within certain parameters to reclassify a controlled substance. 21 U.S.C. Sec. 811. The Attorney General has not elected to reclassify cocaine. There is no requirement that he do so. United States v. Erwin, 602 F.2d 1183, 1185 (5th Cir.), cert. denied, 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980). We therefore find that the appellants' assertion, that the classification of cocaine as a controlled substance pursuant to Schedule II is a denial of equal protection, is unfounded.
 
 
 102
 Accordingly, we affirm the judgment of the Hon. Eugene E. Siler, Jr., United States District Court for the Eastern District of Kentucky.
 
 
 
 [1]
 21 U.S.C. Sec. 841(a)(1) provides:
 (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
 (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.
 
 
 [2]
 21 U.S.C. Sec. 846 provides that:
 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
 
 
 [3]
 18 U.S.C. Sec. 2 provides that:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 
 
 [4]
 Barkas is not a defendant in this case
 
 
 [5]
 According to Agent Best's testimony, cocaine hydrocholoride is soluble in water, and this cocaine sample did not instantly dissolve. This indicated that a large quantity of "cut" or diluent existed in the cocaine. The Chlorox bleach test is a field test which reportedly has merit in the drug subculture
 
 
 [6]
 In Hale the Court found that it was prejudicial error for the trial court to permit cross-examination of respondent concerning his silence during police interrogation. The Court granted a new trial based on its supervisory authority over the lower federal courts. 422 U.S. at 181, 95 S.Ct. at 2139
 
 
 [7]
 7 Encyclopedia Americana, pp. 159-60, (1980), Solomon Garb, M.D. University of Missouri Medical School. Archeological findings have indicated that coca leaf chewing was prevalent among the Incas as early as 500 B.C. The Incas regarded coca as a plant of divine origin and a symbol of high social or political rank. Chewing the leaves reportedly stimulates the central nervous system and produces effects of euphoria
 
 
 [8]
 An alkaloid is any of a large class of organic, nitrogen-containing compounds that have a bitter taste, are usually water insoluble, and alcohol soluble. Random House College Dictionary 35 (3rd ed. 1980)
 
 
 [9]
 Note 7, supra
 
 
 [10]
 Random House College Dictionary, 855 (3rd ed. 1980)
 
 
 [11]
 12 Encyclopedia Britannica, 842 (1980)
 
 
 [12]
 Byck, R. and Van Dyke, C., Cocaine, 246 Scientific American, 128-34 (March, 1982). (The results of a scientific study on the use and effects of cocaine by Craig VanDyke, M.D., Associate Professor of Psychiatry, University of California--San Francisco; and Robert Byck, M.D., Professor of Psychiatry and Pharmacology, Yale University.)