878 F.2d 382
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Steve SEVENSKI, (88-5497) Don Veatch, (88-5498) James
Majors, (88-5499) Dennis Moore, (88-5503)
Defendants-Appellants.
 Nos. 88-5497, 88-5498, 88-5499 and 88-5503.
 United States Court of Appeals, Sixth Circuit.
 July 3, 1989.
 
 Before MERRITT and DAVID A. NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 This is a consolidated criminal appeal by four of seven original defendants from their jury convictions arising out of a bookmaking operation in western Tennessee and Kentucky from October 1986 through Super Bowl Sunday in January 1987. Numerous issues are raised.
 
 
 2
 The only Tennessee defendant-appellant, Dennis Moore, was convicted of all seventeen counts in the indictment. His convictions included (1) conducting an illegal gambling business in violation of 18 U.S.C. Sec. 1955 and Sec. 2, (2) a conspiracy to conduct such a business in violation of 18 U.S.C. Sec. 371, (3) travel in interstate commerce in aid of racketeering in violation of 18 U.S.C. Sec. 1952 (the Travel Act), (4) failure to pay the special tax on acceptance of wagers in violation of 26 U.S.C. Sec. 7262 and (5) twelve counts of transmission of wagering information in interstate commerce by means of a wire facility in violation of 18 U.S.C. Sec. 1084 (the Wire Wagering Act).
 
 
 3
 The Kentucky defendants, James Majors, Steve Sevenski and Don Veatch, were all convicted of the first two counts in the indictment for conducting an illegal gambling business in violation of 18 U.S.C. Sec. 1955 and Sec. 2 and for conspiracy to conduct such a business in violation of 18 U.S.C. Sec. 371. Of these three, only Majors was convicted additionally of count four, which charged him and Moore with a violation of the Travel Act.
 
 
 4
 None of the defendants testified. They challenge the sufficiency of the evidence, certain evidentiary rulings, the legality of a search warrant, and government misconduct before the grand jury. Moore and Majors claim that the government illegally manufactured the interstate element of their Travel Act convictions; only Moore challenges the lack of entrapment instructions with regard to his Travel Act and Wire Wagering Act convictions. We find no error in the rulings of District Judge Todd, and we affirm the convictions of all four defendants.
 
 I.
 
 5
 On Super Bowl Sunday, January 25, 1987, agents of the FBI and IRS, along with six Tennessee police officers, executed a search warrant on the mobile home of Dennis Moore in Obion County, Tennessee. The warrant authorized the agents to search for evidence of gambling violations. In the raid the officers found a calendar/diary with the entries "bank" and "poolroom" along side the notation "w Parlays" for Tuesday, November 11, 1986. There are similar notations for December 16, and January 13 and 20 of the next year. Although none of the Kentucky defendants were present, the notebook contained the headings "Ski," "Veach" and "Maj." An FBI gambling expert, William Holmes, identified the entires in the notebook and on some of the receipts as records of layoff wagers. Holmes, Tr. at 743.
 
 
 6
 Upon entering Moore's home, FBI Agent Stephen found around a table approximately ten persons playing cards with chips. In a back room, the officers found approximately fifteen persons shooting dice with money on the table. In a desk in the same room were line sheets on sporting events.
 
 
 7
 The investigation which led up to this raid began in October 1986 when Charles Roy Pinkelton called the Union City, Tennessee Police Department with information regarding gambling in the western Tennessee area. After Pinkelton described an ongoing booking operation, he agreed to allow Officer Mark Post to monitor and record Pinkelton's conversations with Dennis Moore. Post, Tr. at 386-89. In summary, the contents of the recorded phone conversations entered into evidence revealed that Moore provided Pinkelton with line information, offered Pinkelton a 20% commission for distributing parlays, and told Pinkelton he could take the parlay sheets anywhere he wanted. Moore admitted that he had been in operation for four years although in one phone conversation he did state that he had no parlays going into Kentucky.
 
 
 8
 Pinkelton testified that when Moore had previously mentioned Majors' name, Moore had identified Majors as the "layoff man." Additionally, Moore mentioned with regard to layoffs a man named "Ski," who ran a poolroom in Paducah, Kentucky. Pinkelton's wife, Maynon, testified that on one occasion when she accompanied her husband to Dennis Moore's home, she heard both Dennis and Judith, his wife, use the name of James Majors when discussing layoffs.
 
 
 9
 Beginning on the first day of January 1987, Pinkelton began initiating phone calls from Wingo, Kentucky in which he engaged in a series of sports wagers with Dennis Moore in Tennessee. Post, Tr. at 433-34. These phone calls constitute the proscribed acts for Moore's convictions on twelve counts of violating the Wire Wagering Act. At all times Pinkelton told Moore that Pinkelton was calling from Kentucky. After Pinkelton won $245.00, Moore said that he would bring the money to Pinkelton in Kentucky because Moore went to Majors' real estate office every Friday night. In a later interstate conversation, Moore stated that he was going again to Majors' and that Moore owed Majors "seven." Post, Tr. at 445. Agent Post observed Moore go to Majors' real estate office that same night, January 16, 1987. The next day Moore told Pinkelton that Moore paid "eight big ones"--not "seven"--to Majors. A few days later, when discussing line information, Moore stated that he was going to "Ski's" to settle up.
 
 
 10
 The government introduced toll records of phone numbers listed in the names of James Majors, Boyd-Majors Real Estate, and James Majors' Real Estate, all in Wingo, Kentucky and Steve Sevenski and Don Veatch in Paducah, Kentucky, as well as toll records of Dennis Moore in Martin, Tennessee. The records reflected frequent interstate activity. From December 17, 1986 to January 12, 1987, there were sixty long distance phone calls placed from Dennis Moore's number to numbers listed in the name of Boyd-Majors Real Estate or James Majors. Between November 29, 1986 and January 11, 1987, forty-six calls were made from numbers listed in the name Steve Sevenski and between December 26, 1986 and January 12, 1987, there were twenty-one phone calls from Dennis Moore's number to a number listed in the name of Don Veatch.
 
 
 11
 Testimony from William Holmes, a qualified expert in the field of gambling and in the analysis of gambling documents, testified that a layoff source is needed to operate a sports bookmaking operation with a large number of wagers. A layoff is the rebetting of the wagers from one bookmaker to another, a scheme employed to reduce the financial risk that a bookmaker would have by accepting too much money on one side of a single contest. Holmes testified that the evidence he had analyzed reflected a gambling operation which accepted wagers on sporting events as well as on parlay cards. He identified Dennis Moore as the owner-operator of this gambling operation and an individual by the name of Brandy who assisted Moore. Holmes also testified that based on tapes and betting records he examined the account designations, "Ski," "Maj" and "Veach" were layoff sources and that the records reflected multiple layoff events. Holmes, Tr. at 739-46, 757-59.
 
 II.
 
 12
 All defendants contend that the evidence is insufficient to sustain their convictions for violating 18 U.S.C. Sec. 1955, which makes illegal a gambling business conducted by at least five persons in excess of thirty days. The appellants argue that the government failed to prove the five-person requirement.
 
 
 13
 The five-person, thirty-day requirement means that the government must show that at least five persons were involved in an illegal gambling business for thirty days; the original five may be replaced by others so long as there are always five participants. United States v. Mattuci, 502 F.2d 883, 888 (6th Cir.1974).
 
 
 14
 The indictment in this case alleges that the illegal gambling business commenced at an unknown time before October 31, 1986, and operated continuously until January 25, 1987. The proof at trial undeniably showed participation of Dennis Moore and of Judith Moore, a/k/a "Brandy," from the beginning to the end of the indictment period, a fact admitted by the appellants. Kentucky Defendants' Brief at 39.
 
 
 15
 Mark Graham, an unindicted co-conspirator and co-conductor, testified to continuous betting activity from October 1986 to Super Bowl Sunday, January 25, 1987. He would call in bets for his co-workers and assist them in settling up with the Moores by collecting money from them and placing the money in his vehicle, where Judith Moore would pick it up. Graham, Tr. at 1035-40; Bogle, Tr. at 317-20; Parker, Tr. at 330-35. Entries in the diary/calendar of Judith Moore provide proof that contacts with Graham were regular. Surveillance conducted by the FBI and the Union City Police Department corroborate that the diary entries related to trips by Judith Moore between Phipps' Poolroom and the bank in Tennessee where Mark Graham worked. Post, Tr. at 429; Rhoades, Tr. at 124-26.
 
 
 16
 Testimony at trial showed that Billy Joe Phipps and his co-worker, Barbara Riley, were also involved for the entire period covered by the indictment. The defendants argue, based on a small portion of Riley's testimony, that Riley and Phipps discontinued their involvement in the parlay sheets by the beginning of January 1987 and, consequently, cannot be counted among the five conductors of the illegal gambling business after that date. Nevertheless, taken in the light most favorable to the government, proof existed from which a jury could find that Phipps and Riley were involved in the gambling operation until well into January 1987. Riley's testimony was ambiguous and contradictory with regard to exactly when she and Phipps stopped putting out parlays. Two patrons of Phipps' Poolroom, Bobby Armour and Kenneth Mofield, both testified that they bet parlays and settled up with Billy Joe Phipps and Judith Moore at Phipps' Poolroom from October 1986 through January 1987. On one occasion Mofield settled up with "the girl at the poolroom"; and he identified Barbara Riley as the person who paid him off when he won. Armour, Tr. at 339-42; 347; Mofield, Tr. at 358-64.
 
 
 17
 Benjamin Lindsey, an undercover informant for the Union City Police Department, testified that he saw Judith Moore in Phipps' Poolroom between Christmas 1986 and Super Bowl Sunday 1987. Lindsey, Tr. at 1051, 1053-57, 1071, 1076-77, 1089. Finally, Judith Moore's diary/calendar contained entries showing that she went to the "bank" and "poolroom" on January 13 and 20, 1987. FBI surveillance confirmed the January 13 trip.
 
 
 18
 An expert testified that all of the evidence was consistent with a conclusion that multiple layoff bets were placed between Moore and Sevenski ("Ski"), Majors ("Maj") and Veatch ("Veach") in January, 1987. Holmes, Tr. at 706-07, 722, 738-46, 756-60, 840. Additionally, Roy Pinkelton's testimony implicated Majors and Sevenski; and Maynon Pinkelton implicated James Majors. All of this evidence was sufficient to allow the jury to find that those individuals were a part of the illegal gambling business.
 
 
 19
 Testimony of Chuck Adkins identified Veatch as an active bookmaker in the Paducah, Kentucky area during the time covered by the indictment. Adkins, Tr. at 226-28. Adkins also testified that Veatch along with Moore and Majors would come to Steve Sevenski's Poolroom in Kentucky every Tuesday to settle up. Adkins, Tr. at 229-30, 237.
 
 
 20
 Between December 26, 1986 and January 12, 1987, numerous toll calls were made from Dennis Moore's phones to a number listed to Don Veatch in Paducah, Kentucky. The toll records, along with the proof that Veatch, Moore, Majors and Sevenski settled up at Ski's Poolroom every Tuesday, constitute circumstantial proof that Don Veatch is the "Veach" referred to along with Majors and Sevenski in Dennis Moore's records of multiple layoff wagers on multiple dates. Arguments by defendants that the government failed to prove the identity of persons making the calls or the correlation between the designations "Veach," "Ski" and "Maj" in the diary entries with the phone numbers listed in the respective defendants' names goes to the weight of the evidence and, thus, presents a question properly resolved by the jury. Consequently, we find that sufficient, admissible evidence supports the jury's verdict that the five-person requirement was met and that all four defendants conducted an illegal gambling operation in violation of 18 U.S.C. Sec. 1955.
 
 III.
 
 21
 Defendants next argue with respect to their conspiracy convictions in count two (conspiracy to conduct an illegal gambling operation, to travel in interstate commerce in aid of racketeering, and to use interstate wire facilities to transmit wagering information) that certain evidentiary rulings by the District Judge were reversible errors and that the remaining evidence was insufficient to support their conspiracy convictions.
 
 
 22
 Statements of co-conspirators, which are otherwise hearsay, are admissible if the government shows by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy and, (3) that the statement was made in the course of and in furtherance of the conspiracy. United States v. Vinson, 606 F.2d 149, 152 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980). Additionally, the trial court may consider the hearsay statement itself in making this determination. United States v. Curro, 847 F.2d 325, 328 (6th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 116 (1988) (relying on Bourjaily v. United States, 483 U.S. 171 (1987).
 
 
 23
 The defendants argue that the records of the gambling operation, including those which contain the notations of the layoff wagers to "Ski," "Veach" and "Maj," or "Majors," seized from the Moores' home, should not have been admitted because the government did not prove that the statements were recorded statements of a co-conspirator made during the course and in furtherance of the conspiracy. The record reflects otherwise. The records were found in the Moores' home; and Shiela McQueen, the Moores' cleaning woman, testified that she had seen Dennis Moore answering phones at the desk where the records were found. Additionally, she described the betting slips as those she had previously seen on the desk when she cleaned the Moores' home. McQueen, Tr. at 306-310. Taped conversations also indicate that the Moores kept their gambling records near the phone. We conclude that the gambling records were properly admitted.
 
 
 24
 The defendants further object to the admission of statements made to Roy Pinkelton because he was a government informant; and, thus, they argue, not truly a member of the conspiracy. Unfortunately for those engaged in criminal conduct, one of the risks of a conspiracy is that someone among the group may be a government agent. United States v. Hamilton, 689 F.2d 1262, 1269 (6th Cir.1982), cert. denied, 459 U.S. 1117 (1983). This Circuit has held that statements by an unarrested co-conspirator cooperating with the government are admissible even when these statements were elicited to obtain evidence against the co-conspirators. Id.
 
 
 25
 We have rejected all of the defendants' challenges to the evidentiary rulings. On the basis of this holding, we further conclude that the evidence was sufficient to support the convictions. In particular, we note an argument raised by the defendants in which they claim that the government failed to adduce sufficient evidence that they violated Kentucky law. The answer to this argument is that the relevant statute makes clear that the illegal gambling business must be a violation of the law in "a state in which it is conducted." 18 U.S.C. Sec. 1955(b)(1)(i) (emphasis added). The District Judge took judicial notice of Tennessee gambling laws, and the proof was sufficient to prove a violation of those laws. We, therefore, find no merit to this argument.
 
 
 26
 In order to sustain a conviction for conspiracy to violate 18 U.S.C. Sec. 1955, the government must prove that two or more persons agreed or conspired to operate an illegal gambling business involving five or more persons. United States v. Vigi, 515 F.2d 290, 295 (6th Cir.), cert. denied, 423 U.S. 912 (1975). The evidence recited above is sufficient to prove that each of the defendants participated in such a conspiracy and had knowledge of its scope.
 
 IV.
 
 27
 The defendants argue that prosecutorial misconduct in this case warrants dismissal of the indictment. They point to the cumulative effect of the government's actions (1) in inducing a federal violation, (2) in presenting perjured testimony to a grand jury, and (3) in utilizing threatening and coercive means to induce testimony.
 
 
 28
 Moore admits to committing a local gambling offense but argues the government committed misconduct by injecting the interstate element through Pilkerton's placement of out-of-state phone calls in which he placed sports wagers. This "manufacturing" argument is a variation on the entrapment argument discussed in Section VI below. We hold that the proof negates the argument.
 
 
 29
 Chuck Adkins testified that he called Moore from Paducah, Kentucky in order to obtain line information and place wagers and that Moore would come to Ski's Poolroom in Paducah to settle up with him. Adkins, Tr. at 229-30. Toll records from Moore's phone showed numerous calls to his co-defendants' numbers in Kentucky during the time period covered by the indictment. Additionally, Moore offered to bring money to Kentucky to settle up with the government informant without being asked and subsequently did so. Pinkelton, Tr. at 946-47; Post, Tr. at 441-45. Moore also indicated on several occasions that he was traveling to Kentucky to settle up with co-defendants. Moore's own travel from Tennessee to Kentucky to distribute the proceeds of his illegal gambling business provided the interstate element. Thus, the government did not inject the interstate element into the case. Moore, himself, voluntarily traveled across state lines and used interstate facilities to gamble. He provided the interstate element himself.
 
 
 30
 The defendants claim that government attorneys committed misconduct by coercing grand jury testimony from a target witness, Billy Joe Phipps. In support of this assertion, they offer an out-of-context portion of the testimony of Phipps. In his order denying Moore's pretrial motion to dismiss, the District Judge analyzed the entire exchange, reprinted in his order, and found nothing "at all close to the level of a constitutional violation." Joint Appendix at 141. We agree. In addition, none of Phipps' grand jury testimony was introduced at trial. Moore, therefore, suffered no prejudice.
 
 
 31
 The Kentucky defendants incorporate Moore's arguments in this respect by reference. But Moore's brief makes no mention of any prejudice to these defendants by the government's conduct before the grand jury, and they have shown no error in the District Court's denial of any of their motions to dismiss on this account.
 
 
 32
 Moore also contends that the District Court erred in not disclosing the entirety of the grand jury proceedings to him. The District Court found correctly, however, that Moore did not make a colorable showing that grounds exist for a motion to dismiss the indictment because of matters occurring before the grand jury, the standard in this Circuit. See United States v. Fife, 573 F.2d 369, 370 (6th Cir.1976), cert. denied, 430 U.S. 933 (1977).
 
 
 33
 Finally, Moore contends that the government engaged in misconduct when it failed to seek dismissal of the indictment once it learned that Pinkelton had perjured himself before the grand jury. Pinkelton's perjured testimony was a small part of an otherwise truthful statement before the grand jury. Once the government learned of the perjured testimony, it made known its existence to the court, to the defendants, and to the jury at the outset of Pinkelton's testimony. Pinkelton, Tr. at 911-13. Pinkelton did not repeat the perjured testimony at trial. Given all of these facts, we see no prosecutorial misconduct here nor does case law support the defendants' challenge. See United States v. Griffith, 756 F.2d 1244, 1249 (6th Cir.1985) (actual prejudice must be shown before an indictment will be dismissed on the basis of prosecutorial misconduct).
 
 V.
 
 34
 The defendants argue that the District Judge should not have admitted evidence seized from the Moores' home pursuant to a search warrant. They claim that the warrant itself lacked particularity, and that the affidavit in support of the warrant was unreliable and was insufficient to establish probable cause.
 
 
 35
 Reviewing the twelve page affidavit of Agent Post, we find that the District Court did not err in concluding from the facts and circumstances described in the affidavit that probable cause did exist and that evidence of a crime would be found at the Moores' home, as indeed it was. Consequently, the affidavit met the test set forth in Illinois v. Gates, 462 U.S. 213 (1983).
 
 
 36
 The items listed for seizure on the warrant are supported by the affidavit and are described as particularly as possible given the broad array of items that can constitute gambling records. Our Circuit has held that a generic description is permissible where greater specificity is not possible. Sovereign News Co. v. United States, 690 F.2d 569, 576-77 (6th Cir.1982), cert. denied, 464 U.S. 814 (1983). Consequently, we find that the District Court did not err in admitting evidence seized from Dennis Moore's home pursuant to a search warrant.
 
 VI.
 
 37
 Moore argues that he was entrapped into violations of the interstate element of the Travel and the Wire Wagering Acts; consequently, under the recent Supreme Court decision, United States v. Mathews, 108 S.Ct. 883 (1988), he claims that he was entitled to an entrapment instruction. He says that the only proof with regard to his interstate travel and use of the telephone came from phone calls initiated by Pinkelton. Moore argues that the conduct of the government showed a clear pattern of establishing periodic telephone contact with Moore from telephones in Tennessee and that once the government informant induced Moore to accept wagers, the F.B.I. began to have calls placed from Kentucky in order to set up violations of federal law.
 
 
 38
 Although we agree that Moore could have been entitled to an entrapment instruction in light of the recent Mathews decision if the evidence presented a jury question as to his predisposition to commit the interstate element of the Travel Act and Wire Wagering Act offenses, we find that those circumstances do not exist under the facts of this case. In Mathews the Supreme Court held, contrary to the previous law of the Sixth Circuit, see United States v. Whitley, 734 F.2d 1129, 1138-39 (6th Cir.1984), that even if the defendant in a federal criminal case raises inconsistent defenses--the defense that he did not commit the crime and the defense that he was entrapped into commission of the crime--he is still entitled to an entrapment instruction if there is sufficient evidence from which a reasonable jury could find entrapment. The Court went on to restate its position that the entrapment defense has two related elements: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in the criminal conduct. Mathews, 108 S.Ct. at 884. The question of predisposition, as the Court previously had said in Sherman v. United States, 356 U.S. 369, 372 (1958), focuses upon whether the defendant was an "unwary innocent," or instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the crime. In the Mathews case, the Supreme Court remanded the case for the Court of Appeals to answer the question of whether the evidence at trial was insufficient to support an instruction on the defense of entrapment.
 
 
 39
 The trial judge below apparently anticipated the possible result in Mathews and considered giving the entrapment instructions even though Moore denied commission of the crime. In effect, the judge answered the question in the case before him that the Supreme Court in Mathews specifically left open in the case before it: namely, whether the entrapment instruction should be given in spite of the inconsistent defenses. Judge Todd concluded in the case before us that there was no evidence of pressure by the government to cause the defendant to commit any crime. Tr. at 1204. We agree. The record reflects, and Moore concedes on appeal, that he was actively engaged in sports wagering. At trial the government played a tape which contained a statement by Moore, indicating that he had been engaging in this activity for approximately four years. There was testimony from numerous government witnesses that both Dennis and Judith Moore gave out line information and accepted wagers from individuals without any inducement whatsoever by the government. Additionally, Adkins testified that he had called the Moores' residence from Kentucky to place wagers. He also testified that every Tuesday he would settle up with Moore and with the Kentucky defendants at Ski's poolroom in Paducah, Kentucky. Toll records indicate numerous interstate conversations between Moore and the Kentucky defendants. Testimony from the government's gambling expert also identified the Kentucky defendants as layoff sources.
 
 
 40
 Even though Mathews has changed the law of this Circuit regarding the necessity of admitting all elements of the crime before pleading the entrapment defense, Moore was still not entitled to an entrapment instruction because, as Judge Todd found, Moore was clearly predisposed to engage in the proscribed gambling activity, including the interstate element of the crime. There was no colorable jury issue on Moore's predisposition to commit the interstate element. As the Mathews Court points out in the next to last sentence of the decision, "evidence that government agents merely afforded an opportunity or facilities for the commission of the crime would be insufficient to warrant such an [entrapment] instruction." Mathews, 108 S.Ct. at 888. In this case the government simply gave Moore another opportunity to conduct his longstanding illegal gambling business and accept wagers by phone, across state lines. Thus, Judge Todd's decision not to give the requested entrapment instruction, based on his articulated reasons of ample predisposition and lack of government inducement, should not be overturned despite the intervening Mathews case.
 
 
 41
 We have reviewed all the numerous challenges of the defendants and upon a thorough review of the record find no merit in any of them. Consequently, the judgment of the District Court is affirmed.