941 F.2d 1210
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Lee SMITH (No. 90-4041), Donald Dozier (No. 90-4062)
a/k/a Darrell Thomas, Defendants-Appellants.
 Nos. 90-4041, 90-4062.
 United States Court of Appeals, Sixth Circuit.
 Aug. 19, 1991.
 
 Before RALPH B. GUY, Jr., and RYAN, Circuit Judges, and HULL, Chief District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Defendants, Donald Dozier and Robert Lee Smith, were convicted of conspiring to distribute cocaine base, in violation of 21 U.S.C. § 846, and of possessing with intent to distribute cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii) and 18 U.S.C. § 2. Dozier was also convicted of unlawfully distributing one-quarter gram of cocaine base, in violation of 21 U.S.C. § 841(a)(1), and Smith was convicted of knowingly and intentionally making a residence available for the purpose of storing and distributing cocaine base, in violation of 21 U.S.C. § 856(a)(2).
 
 
 2
 Both defendants appeal their convictions and sentences. Defendants argue (1) that evidence introduced at trial was obtained through an illegal search and seizure and that the district court erred in denying their motions to suppress this evidence; (2) that the district court erred in denying defendants' motion for pretrial disclosure of the identity of the government's confidential informant; (3) that the district court erred by not declaring a mistrial or striking the in-court eyewitness identification of Dozier, due to the government's tardy disclosure of a pretrial identification procedure involving a suggestive photographic array and due to the danger that the suggestive procedure caused the misidentification of Dozier; (4) that the district court erred by giving a curative instruction to the jury concerning unsubstantiated drug sales, rather than declaring a mistrial; and (5) that the sentences imposed by the district court were not in conformity with the sentencing guidelines.
 
 
 3
 We find each of these challenges to be without merit and affirm the convictions and sentences.
 
 I.
 
 4
 On May 19, 1990, Steve Gilliam, a confidential informant working for the Columbus Police Department, made a controlled buy of approximately .015 grams of crack cocaine. Gilliam, who had been supplied money by the police, made the purchase at 1140 Oak Street, Apartment 1, Columbus, Ohio (apartment 1). While approaching the multi-unit apartment building to make the purchase, Gilliam noticed that there were two lookout persons, one positioned on the steps to the building and one positioned inside an apartment window. Entry to the building could only be gained by means of a key to the front and rear outer security doors, or by a resident opening the door from the inside. Gilliam entered the building by ringing the doorbell at the security entrance, whereupon he was admitted into a common hallway and led to the door of apartment 1. After purchasing the cocaine and returning it to the police, Gilliam reported to the police that he bought the cocaine from a medium-sized, black male carrying an automatic weapon.
 
 
 5
 A search warrant was subsequently obtained for apartment 1 and "the curtilage thereof," (app. 244), pursuant to the affidavit of Detective Michael S. Kididis. Detective Kididis' supporting affidavit, dated May 22, 1990, states that "within the past 72 hours" Gilliam entered apartment 1 of 1140 Oak Street pursuant to a controlled buy, that Gilliam purchased cocaine inside the premises and saw "Cocaine being kept and dispensed out of the premises," that Gilliam "knows what Cocaine looks like [and] how it is packaged," and that the affiant assisted in a field test identifying the substance purchased by Gilliam as cocaine. Kididis' affidavit also stated the following:
 
 
 6
 The informant has participated in numerous controlled purchases of Cocaine and has given information on drug traffickers which was proven factual. The informant has purchased Cocaine out of these premises in the recent past with recorded City funds.
 
 
 7
 The affiant's experience in executing numerous Search Warrants on locations where "Crack" Cocaine is sold, has established that the illegal sales are completed with more than one (1) person present on the premises and that drugs, drug monies or other contraband, unknown at this time, may be concealed or transferred to any person inside the residence prior to the police entering....
 
 
 8
 (App. 247).
 
 
 9
 The search warrant authorized a search for cocaine, papers indicating occupancy, drug paraphernalia, drug records, drug monies, and other evidence of illicit drug trafficking. Further, in response to Detective Kididis' affidavit statement that a search under cover of darkness would allow the officers to "approach the house undetected" and reduce the "chance for the occupants to conceal or destroy the drugs," the warrant authorized a nighttime search.
 
 
 10
 Just a few minutes past midnight on May 24, 1990, Gilliam made another controlled purchase of .1383 grams of cocaine at apartment 1. Gilliam testified that he saw four to six people in the apartment at the time of the purchase and that two persons, including the seller, carried automatic weapons. Gilliam further testified that he purchased the cocaine from a black male, approximately 5' 9" tall, weighing about 160 pounds, and wearing a bright, red and white jogging suit. The seller, whom Gilliam identified at trial as defendant Dozier, dispensed the crack cocaine from a brown prescription pill bottle.
 
 
 11
 Within twenty minutes of Gilliam's May 24 purchase, Columbus Police Department SWAT officers executed the search warrant for apartment 1, as well as another search warrant for apartment 7, by conducting a nighttime raid. Using a battering ram, the police forced an entry into the apartment building through the rear hallway door without knocking or announcing their presence. The police proceeded through the hallway to the door of apartment 1. The officers then announced themselves as police and yelled, "Search warrant." Both before and after knocking and announcing their presence, the police heard scurrying sounds inside the apartment. After being advised by officers outside the building that people were leaving the apartment through windows, the officers at the apartment door opened the unlocked door, threw in a diversion device, and entered the apartment.
 
 
 12
 Officer Scanlon, one of the SWAT officers who made the entry, testified that the officers executing the search warrant had been informed beforehand that persons inside apartment 1 might have firearms. The officers were also aware that an informant had made a controlled drug purchase just moments earlier from a person described as a black male wearing a red jogging suit. As the police were entering the apartment, a man matching that description was observed leaving through a window and running from the scene. After a SWAT officer flagged down a police cruiser and described to the patrol officer the individual seen fleeing from the scene, the two officers went in pursuit of the man. They found an individual fitting the description of the fleeing man hiding under bushes in a ravine about 100 yards from the apartment. The officers handcuffed the man, later identified as defendant Dozier, and raised him to his feet. The officers then observed a brown prescription pill bottle on the ground where Dozier had been hiding. The officers recovered the pill bottle, later determined to contain 12.68 grams of cocaine, and took Dozier back to apartment 1 where he was placed under arrest and searched. The search revealed that Dozier was carrying $214.00, including $20.00 in prerecorded money that Gilliam had used earlier that night when making the controlled purchase.
 
 
 13
 Six individuals were found when officers executing the warrant entered the apartment, and police recovered two separate small quantities of cocaine, three firearms, and various drug paraphernalia while executing the search. Defendant Smith was found in the apartment lying prone on a pile of clothes. David Fisher, the landlord for apartment 1 of 1140 Oak Street, later identified Smith as the lessee of apartment 1. Fisher testified that he had observed Smith occupying apartment 1 during May 1990 when he visited Smith earlier that month to complain about the high volume of visitors going in and out of the apartment.
 
 
 14
 Dozier and Smith were subsequently indicted by a grand jury on several counts relating to narcotics trafficking. The indictment charged Dozier and Smith with conspiring to distribute cocaine base, in violation of 21 U.S.C. § 846 (Count 1), and with unlawfully possessing with the intent to distribute approximately 13 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii) and 18 U.S.C. § 2 (Count 3). Count 2 charged Dozier with distributing cocaine base in violation of 21 U.S.C. § 841(a)(1), and Count 4 charged Smith, as lessee, with knowingly and intentionally making a residence available for the purpose of unlawfully storing and distributing cocaine base in violation of 21 U.S.C. § 856(a)(2). Defendants entered pleas of not guilty on all counts charged.
 
 
 15
 Each defendant filed several pretrial motions, including a motion to suppress physical evidence seized during the drug raid on apartment 1 and a motion for disclosure of the identity and whereabouts of the government's participant-informant. Defendants also filed papers requesting that the government disclose information governed by Rule 16 of the Federal Rules of Criminal Procedure and exculpatory information governed by the Brady rule. In support of their motion to suppress evidence, defendants argued that Detective Kididis' affidavit was insufficient to support a search warrant, that the SWAT officers' failure to knock and announce at the rear entry to the hallway of the apartment violated statutory and constitutional rules governing searches, and that the search of Dozier leading to the recovery of the pill bottle and the marked money exceeded the scope of the search warrant. Subsequent to a hearing on the matter, the district court rejected defendants' arguments and denied the motion to suppress evidence. With respect to the disclosure of Gilliam's identity, the district court denied the motion, stating that defendants had not demonstrated good cause for the disclosure.
 
 
 16
 On the first day of trial, the police case agent informed government counsel of the existence of a photospread shown to Gilliam prior to trial, three weeks after the night of Gilliam's controlled drug buy and the execution of the search warrant. Upon informing counsel that an array of ten photographs was used to obtain a pretrial identification of Dozier as the seller of cocaine to Gilliam, the case agent provided government counsel with the photos. Also on the first day of trial, government counsel looked at the photo array, and upon realizing that there were nine photos of males in blue prison garb and one photo of Dozier wearing a red jogging suit, counsel for the government deemed the photo spread to be suggestive.
 
 
 17
 On the second day of trial, the government called Gilliam as a witness and had him identify Dozier as the person who sold him cocaine base. At trial, Gilliam also identified Dozier as the person depicted in a single photograph of an individual wearing the same red jogging suit that was depicted in the photo array. At the conclusion of defense counsel's cross-examination, but before Gilliam was excused, the government disclosed to the court and the parties the existence and prior use of the photo array. Defense counsel then moved to strike the in-court identification testimony or, in the alternative, for a mistrial, on the basis that the suggestive pretrial identification tainted Gilliam's in-court identification.
 
 
 18
 In response to defendants' motion, the district court proceeded to hold a hearing in order to determine whether the photo spread was impermissibly suggestive, and if so, whether the effect of the pretrial photo identification so tainted the witness' in-court identification that it should be stricken or a mistrial declared. At the hearing, Detective Kididis testified that he conducted the photo array identification procedure with Gilliam, asking him to pick from the ten photos anyone who looked like persons he saw when doing the controlled drug buys at apartment 1. The photo array contained a photo of Smith, as well as Dozier, but Gilliam picked out only the photo of Dozier.
 
 
 19
 Gilliam testified that he did not base his selection of Dozier on the fact that Dozier was wearing the red jogging suit. Gilliam testified that he remembered how Dozier "looked all together ... how he looked entirely," because he stood a foot in front of Dozier and looked right at him during the drug transaction. (App. 203). Gilliam further testified that one of his purposes in doing the drug transaction was to come back and give a good description of the seller to the police, that he therefore closely observed the seller's face during the 30 seconds he stood right in front of him, and that he observed Dozier in good lighting. Based on the hearing testimony and the photo array, the district court concluded that the photo array was unduly suggestive. However, based on the circumstances surrounding Gilliam's observations during the night in question, the court ruled that the in-court identification by Gilliam was reliable and independent of the photo array, and the court denied defendants' motion to strike Gilliam's in-court identification or declare a mistrial.
 
 
 20
 At trial, defendants objected to the testimony given by a Detective Secrest concerning two controlled buys at 1140 Oak Street on May 15, 1990, and two exhibits (government's exhibits 2 and 6) identified as cocaine base purchased during those two transactions. The basis of the objection was that both apartment 1 and apartment 7 at 1140 Oak Street were being investigated for narcotics trafficking during May 1990, and that Secrest could not testify as to which apartment the May 15 transactions pertained to. The controlled buys were conducted not by Gilliam, but by another participant-informant who was not available to testify as to whether the transactions took place at Smith's apartment or apartment 7, and thus the relevancy of these buys to Smith and Dozier could not be established.
 
 
 21
 Defendants asked the court to strike the testimony or, in the alternative, to declare a mistrial. Before the court ruled on the matter, defendants argued that prejudice resulting from Secrest's testimony could not be cured by instructions to the jury and that a mistrial was required. The district court decided to resolve the matter by giving the following curative instruction to the jury:
 
 
 22
 THE COURT: Now, ladies and gentlemen, Detective Secrest, as you know, has testified about a controlled purchase of cocaine using a confidential informant other than Mr. Gilliam from 1140 Oak Street on May 15 of 1990, but as you folks also know from other evidence, there were two apartments in that apartment building that were under investigation, and in fact there were--and there is no evidence at this time that would furnish a basis for any finding that on May 15, 1990, there was any purchase of cocaine from Apartment 1. So now that we have heard all of Detective Secrest's testimony, we are still left with the fact that also no evidence from which any conclusion could be reached that any illegal drug transaction occurred in Apartment 1 at 1140 Oak Street on May 15, 1990, so I am instructing you as a matter of law that you are not to consider in any way this evidence that you have heard about a confidential informant going into 1140 Oak Street on May 15, 1990. You are just simply to totally and completely disregard that particular evidence, period.
 
 
 23
 (App. 160-61).
 
 
 24
 At the end of trial, the jury returned verdicts of guilty as to each defendant on all counts charged. At the sentencing hearing, defendants raised several objections to the findings and recommendations contained in their respective presentence reports, and we set forth only those objections relevant to their arguments on appeal. Dozier and Smith objected to the recommendation that they were not entitled a two point reduction for acceptance of responsibility, arguing that the recommendation penalized them for maintaining their innocence while pursuing their right to a trial and appeal. Dozier and Smith also objected to the enhancement of their sentences for possession of firearms, arguing that the government did not present until after trial evidence that the firearms recovered at apartment 1 were operable. Finally, Smith argued that he was entitled to a three or four point reduction for being a "minimal participant," rather than the two point reduction as a "minor" participant recommended in the presentence report.
 
 
 25
 The district court was not persuaded by these arguments, and, with respect to the objections set forth here, the court adopted the factual findings and sentence recommendations contained in the presentence reports. Dozier was sentenced to 102 months imprisonment and a five-year term of supervised release. Smith received a sentence of 78 months imprisonment and a four-year term of supervised release. Timely notices of appeal were filed by each.
 
 II.
 
 26
 Defendants argue that evidence seized during the raid on Smith's residence was obtained through an illegal search and seizure and, therefore, should not have been admitted at trial. Defendants challenge the issuance and execution of the search warrant by arguing that (1) the information in the affidavit supporting the issuance of the search warrant was too stale to establish probable cause that contraband would be found at the residence and insufficient to support a nighttime search, (2) the officers executing the search warrant failed to comply with rules requiring a "knock and announce," and (3) the search of Dozier's person went beyond the scope of the search warrant. We address these arguments seriatim.
 
 A.
 
 27
 In support of his proposition that the information in the affidavit was stale, Dozier argues that the affiant, Detective Kididis, relied on information obtained during a controlled buy of cocaine that took place almost 72 hours before the signing of the affidavit and issuance of the search warrant. Dozier argues that the facts supporting the affidavit are not "so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." Sgro v. United States, 287 U.S. 206, 210 (1932). Dozier adds that information based upon a single transaction is not sufficient to support a finding that the criminal conduct is continuing beyond the time of that transaction. We find Dozier's arguments to be without merit.
 
 
 28
 The task of the judicial official issuing the search warrant "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "[S]o long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Gates, 462 U.S. at 236 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)). This does not mean that reviewing courts should rubber stamp a magistrate's finding of probable cause. However, the Supreme Court has emphasized that our "after-the-fact scrutiny" of a magistrate's finding of probable cause should not take the form of de novo review. Id. Instead, the magistrate's finding "should be paid great deference by reviewing courts." Id.
 
 
 29
 We believe that Detective Kididis' supporting affidavit provides a substantial basis for concluding that probable cause existed. The affidavit states that an informant made a controlled purchase of cocaine within 72 hours of the making of the affidavit, that the informant made previous purchases from the same residence, that the informant proved to be reliable in numerous other controlled purchases, and that the informant observed cocaine being kept and dispensed out of the premises. The question of staleness "must be determined by the circumstances of each case," Sgro, 287 U.S. at 210-11, and "we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." United States v. McCall, 740 F.2d 1331, 1336 (4th Cir.1984). In the instant case, although the nature of the evidence sought is not intrinsically likely to remain at the location where it was originally observed, the nature of the activity alleged in the affidavit does present a fair probability that an ongoing operation was involved. The fact that the bulk of the affiant's information was obtained from a controlled purchase nearly 72 hours preceding the making of the affidavit does not vitiate the fair probability that a search of Smith's apartment would uncover contraband or evidence of a crime.
 
 
 30
 Similarly, we find no merit to Dozier's contention that the grounds advanced in the affidavit were insufficient for a nighttime search. The affiant stated that a nighttime search was being requested because "[t]he cover of darkness will allow the officers executing the warrant to approach the house undetected. Thus, there will be less chance for the occupants to conceal or destroy the drugs." (App. 245). Nighttime execution of a search warrant is permissible under Federal Rule of Criminal Procedure 41(c)(1), as well as the analogous Ohio rule, if nighttime execution is specifically provided for in the warrant and is supported by "reasonable cause." Fed.R.Crim.P. 41(c)(1); Ohio Crim.R. 41(C). The federal rule "requires only some factual basis for a prudent conclusion that the greater intrusiveness of a nighttime search is justified by the exigencies of the situation." United States v. Searp, 586 F.2d 1117, 1121 (6th Cir.1978). In this case, the search warrant specifically authorized a nighttime search, and we believe the authorization was reasonable in light of the affiant's reasons for requesting a nighttime search.
 
 B.
 
 31
 We next address defendants' argument that the search warrant was unlawfully executed due to the failure of police to knock and announce prior to entering the outer door to the corridor of the apartment building. The government does not deny that the police executing the warrant did not knock and announce their presence prior to making a forcible entry through the rear security door of the apartment building. Because defendants do not contest on appeal the manner of entry into the individual apartment, we address only the police entry into the common hallway of the apartment building.
 
 
 32
 Generally, officers who have constitutional authority to enter a home must announce their authority and purpose before entering and may resort to forcible entry only if denied admittance. Although both fourth amendment and statutory "knock and announce" strictures govern the execution of federal arrest and search warrants in private dwellings, 18 U.S.C. § 3109,[1] in this case, we have a search warrant executed by state officials. Nevertheless, constitutional standards also govern how state officers enter a suspect's home to search and arrest, Ker v. California, 374 U.S. 23 (1963), and, although the federal knock and announce statute does not directly govern the conduct of state officials executing a state warrant, the fourth amendment "embraces the principles of § 3109." United States v. Andrus, 775 F.2d 825, 844 (7th Cir.1985). Moreover, in the instant case, the conduct of state officials executing a search warrant is governed by a state statute analogous to 18 U.S.C. § 3109.[2]
 
 
 33
 If evidence is procured in violation of section 3109, that evidence may be suppressed. Miller v. United States, 357 U.S. 301, 313-14 (1958). The knock and announce rule serves several purposes: (1) it decreases the potential for violence to police officers and occupants, (2) it protects the privacy of individuals by minimizing the chance of forcible entry into a dwelling of the wrong person, and (3) it prevents the physical destruction of property by giving the occupant time to admit officers voluntarily. United States v. Ruminer, 786 F.2d 381, 383 (10th Cir.1986). The district court, in the instant case, decided that the interests of the knock and announce rule were not sufficiently implicated by entry into a common hallway to require application of the rule, that the privacy interest in a common hallway is less compelling than the privacy interest inherent in an individual apartment, and that the officers executing the search warrant complied with the knock and announce rule by making an announcement at the door of apartment 1. Alternatively, the district court found that exigent circumstances warranted a departure from strict adherence to the rule.
 
 
 34
 We find it unnecessary to hold in this case, as the district court did, that the knock and announce rule does not apply to entrances to common areas of a multi-unit apartment building. Although this Court has recognized the principle that tenants of an apartment building have a reasonable expectation of privacy in the common areas of the building not open to the general public, United States v. Carriger, 541 F.2d 545, 549-50 (6th Cir.1976) (citing McDonald v. United States, 335 U.S. 451, 458-59 (1948) (Jackson, J., concurring)), the law is not well settled in this area, and courts disagree as to the applicability of the knock and announce rule in these situations. See United States v. Fluker, 543 F.2d 709, 715-16 (9th Cir.1976) (section 3109 applies to the outer door of an apartment building where the common door is locked and access is clearly limited as a matter of right to the occupants of the individual apartments); United States v. Blank, 251 F.Supp. 166 (N.D.Ohio 1966). But see United States v. Alatishe, 616 F.Supp. 1406, 1413 (D.D.C.1985) (failure to knock and announce at outside doorway to common hallway does not give rise to violation of section 3109 where the outer door is some distance from the apartment); United States v. Holland, 755 F.2d 253, 255-56 (2d Cir.) (the entranceway to a common hallway is not capable of harboring a reasonable expectation of privacy due to its inherently public nature), cert. denied, 471 U.S. 1125 (1985).
 
 
 35
 To adopt the rule articulated by the district court is to rule more broadly than the facts of this case require. However, we agree with the district court that exigent circumstances made strict adherence to the knock and announce rule inappropriate in this case.[3]
 
 
 36
 The parties acknowledge that courts have upheld searches that failed to comply with section 3109 where exigent circumstances have existed to render strict compliance inappropriate and imprudent. United States v. Spinelli, 848 F.2d 26 (2d Cir.1988); United States v. Barrientos, 758 F.2d 1152 (7th Cir.1985), cert. denied, 474 U.S. 1062 (1986). In the instant case, the district court found that officers had information from a credible informant that could have led the police to reasonably believe the occupants of apartment 1 were armed and dangerous. The police officers also had reliable information that the occupants had possession of cocaine that could have been destroyed or disposed of quickly had the police given warning of their presence and purpose. These findings have support in the record, and the threat to the officers' safety and the need to preserve narcotics evidence justify the failure to comply with section 3109.[4] See United States v. Nabors, 901 F.2d 1351, 1354 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 192 (1990); Barrientos, 758 F.2d at 1159.
 
 
 37
 We do not hold that noncompliance with section 3109 is justified every time law enforcement personnel suspect that the subject of a search warrant possesses a firearm. See Nabors, 901 F.2d at 1354. Rather, there must be a reasonable belief that announcement might place the officers or others in physical peril. United States v. Ramirez, 770 F.2d 1458, 1460 (9th Cir.1985). Nor do we hold that any slight possibility of destruction of evidence, standing alone, will always excuse noncompliance with the knock and announce rule. To create such a rule would make section 3109 a nullity every time police claim to suspect the presence of narcotics, as the possibility of the destruction of evidence exists in every narcotics investigation. Nevertheless, where the nature of the exigency is both "the possibility of destruction of evidence" and "the danger of harm to the officers," and, where the evidence of the exigency is "clear" and "manifest," the belief that great exigency does in fact exist is reasonable. United States v. Bonner, 874 F.2d 822, 827 (D.C.Cir.1989).
 
 C.
 
 38
 We next address Dozier's argument that the search of his person exceeded the scope of the search warrant because the warrant did not authorize a search of persons. We conclude that the officers executing the search warrant had probable cause to arrest Dozier and that the pill bottle containing cocaine and the money found on Dozier were validly seized during a search incident to arrest.
 
 
 39
 Probable cause to arrest exists if at the moment of arrest the facts and circumstances known to the arresting officers are "sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 244 n. 13 (1983). See also Texas v. Brown, 460 U.S. 730, 742 (1983). Moreover, the existence of probable cause should be determined on the totality of the circumstances, which analysis includes a realistic assessment of the situation from a law enforcement officer's perspective. United States v. Barrett, 890 F.2d 855, 861 (6th Cir.1989).
 
 
 40
 At the time of the police raid, one of the officers executing the search warrant saw a man leave the apartment through a window and run from the scene. After obtaining the aid of a patrol officer and describing to him the individual seen fleeing from the scene, the patrol officer and SWAT officer went in pursuit of the man. They found an individual, fitting the description of the man seen fleeing the scene, hiding under bushes in a ravine about 100 yards from the apartment. These facts, in combination with the officers' awareness that the apartment subject to the raid was believed to be a distribution point for cocaine, provided the officer arresting Dozier with sufficient probable cause to believe that Dozier was involved in drug trafficking. After making a valid arrest, police may conduct a warrantless search of the suspect's person and of the area within the suspect's immediate control. United States v. Robinson, 414 U.S. 218, 235 (1973); Chimel v. California, 395 U.S. 752, 763 (1969); United States v. Salazar, 805 F.2d 1394, 1399 (9th Cir.1986) (search before formal arrest is nevertheless incident to arrest because probable cause existed before the search). Consequently, the evidence seized after Dozier was discovered and detained--the pill bottle found on the ground near Dozier and the money found in his pocket--was seized during a search incident to a valid arrest.
 
 III.
 
 41
 Defendants claim several prejudicial errors involving the testimony of Gilliam, the government's witness and confidential informant. Defendants argue (1) that the court erred in denying their motion for pretrial disclosure of Gilliam's identity and whereabouts, (2) that the government had a duty to disclose before trial the existence and use of the suggestive photographic array, (3) that these nondisclosures prejudiced defendants' ability to prepare an adequate defense, and (4) that Gilliam's in-court eyewitness identification of Dozier was tainted by the photo array and required the district court to declare a mistrial.
 
 A.
 
 42
 The Supreme Court has recognized that the government has a privilege not to disclose the identity of persons who furnish information regarding violations of the law. Roviaro v. United States, 353 U.S. 53 (1957). Nevertheless, this privilege is limited "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause...." Id. at 60-61. See also United States v. Whitley, 734 F.2d 1129 (6th Cir.1984).[5] In the instant case, the district court apparently concluded that Gilliam's identity was neither relevant nor essential under the particular circumstances of the case, as the court denied defendants' motion for pretrial disclosure on the basis that defendants had "not shown good cause for disclosure under Roviaro...." (App. 72)
 
 
 43
 However, "[t]his Court has required disclosure of an informant's identity when the informer was an eyewitness to, and in fact a participant in, the exchange of contraband by the defendant seller." Whitley, 734 F.2d at 1138 (citing United States v. Barnett, 418 F.2d 309 (6th Cir.1969), and United States v. Lloyd, 400 F.2d 414 (6th Cir.1968)). Based on the facts of the instant case, where Gilliam was both an eyewitness to and a primary participant in a key drug transaction, his identity was "relevant and helpful to the defense" and "essential to a fair determination of the charges." Therefore, we find that the district court improperly denied the motion for disclosure where the government failed to advance some valid reason for the nondisclosure.
 
 
 44
 Nevertheless, because we find that this error did not prejudice defendants' ability to prepare an adequate defense, the error is not grounds for reversal of defendants' convictions. Improper denial of a discovery request does not mandate overturning a conviction, and defendants must show prejudice to their defense caused by the failure to disclose Gilliam's identity and whereabouts. United States v. Fischel, 686 F.2d 1082, 1093 (5th Cir.1982). The cases cited herein supporting disclosure, Roviaro, Barnett, and Lloyd, involved nondisclosures that had the effect of preventing informants from being called as witnesses and testifying at trial--where they might have been a material witness or might have presented testimony relevant or essential to the case. Roviaro, 353 U.S. at 55-56; Barnett, 418 F.2d at 312; Lloyd, 400 F.2d at 416. In the instant case, Gilliam was not just a possible witness but an actual witness. Defendants not only knew the informer's identity at trial, but also exercised their opportunity to cross-examine Gilliam. Consequently, defendants had access at trial to the very information they sought in their pretrial discovery motion, and we find the district court's failure to order pretrial disclosure of the witness's identity and whereabouts was harmless error.
 
 B.
 
 45
 Defendants argue that they were entitled to pretrial disclosure of the existence of the suggestive photographic array used to obtain a pretrial identification of Dozier. Pursuant to the rule enunciated in Brady v. Maryland, 373 U.S. 83 (1963), the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. To come within the ambit of the Brady rule, evidence need not be exculpatory in the sense of tending to negate guilt. United States v. Presser, 844 F.2d 1275, 1278 (6th Cir.1988). Rather, impeachment evidence that would tend to undermine the credibility of an important government witness falls within the Brady rule. Id. In Giglio v. United States, 405 U.S. 150, 154 (1972), the Supreme Court held that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."
 
 
 46
 In the instant case, the reliability of Gilliam's eyewitness testimony may well have been determinative of the guilt or innocence of the accused, as Gilliam was the only witness who testified to seeing Dozier dealing in narcotics at Smith's residence. Consequently, Brady required the disclosure of Gilliam's previous attempts to identify Dozier, including the use of the suggestive photographic array, as Gilliam's prior identifications and the circumstances in which they were given had bearing on the reliability of his in-court eyewitness identification. Although Brady is not applicable to information that the prosecutor did not possess or have knowledge of, and the prosecutor appears to have had no pretrial knowledge of Gilliam's photo array identification, the duty to disclose continues throughout the proceedings. See Mooney v. Holohan, 294 U.S. 103, 108 (1935). Therefore, upon learning of the photo array on the first day of trial, the prosecutor should have disclosed the material to the accused before placing Gilliam on the stand or at least submitted the question of the material's exculpatory nature to the court. See United States v. Starusko, 729 F.2d 256, 263 (3d Cir.1984).
 
 
 47
 Although the government failed to disclose Brady material in this case, the defendant has a constitutional remedy only if he can show that there is a reasonable probability that "the omission deprived the defendant of a fair trial." Presser, 844 F.2d at 1282 (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)). If previously undisclosed evidence is disclosed, as here, during trial, no Brady violation occurs unless the defendant has been prejudiced by the delay in disclosure. United States v. Holloway, 740 F.2d 1373, 1381 (6th Cir.), cert. denied, 469 U.S. 1021 (1984). Defendants were not prejudiced by the tardy disclosure of the photographic array because defendants received the information in time to use it for cross-examination at the hearing on their motion to strike Gilliam's in-court eyewitness identification. See United States v. Boling, 869 F.2d 965, 975 (6th Cir.1989); United States v. Blanco, 844 F.2d 344, 352 (6th Cir.), cert. denied, 486 U.S. 1046 (1988).
 
 
 48
 Smith argues that he was prejudiced by the government's tardy disclosure because he was not able to use the evidence that Smith was not identified in the photo array to attack the credibility of Gilliam during Gilliam's initial testimony. Defendants chose only to use the photo array material to cross-examine Gilliam at the suppression hearing; however, they could have requested permission to recall Gilliam for the purpose of cross-examining him before the jury and attacking the reliability of his in-court identification. Accordingly, the tardy disclosure of the photographic array did not deprive defendants of a fair trial and there was no due process violation requiring that the verdict be set aside.[6]
 
 C.
 
 49
 Defendant Dozier argues that the in-court identification of him by witness Gilliam was the result of the suggestive photo array identification. Defendant Smith agrees with Dozier that Gilliam's in-court identification of co-defendant and co-conspirator Dozier created a substantial likelihood of misidentification and that the identification of Dozier was crucial in establishing the government's case against Smith.
 
 
 50
 The district court found that the photo array was "unduly suggestive." (App. 218). However, as the district court properly noted, suggestiveness of the identification procedure does not merit suppression by itself. As we stated in United States v. Hamilton, 684 F.2d 380, 383 (6th Cir.), cert. denied, 459 U.S. 976 (1982), the standard is "whether, under the totality of the circumstances, there was an impermissibly suggestive identification procedure used which caused a very substantial likelihood of irreparable misidentification."
 
 
 51
 The central focus is on the reliability of the identification. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Reliability is tested by considering the following factors: (1) the opportunity of the witnesses to view the criminal; (2) the witnesses' degree of attention; (3) the accuracy of the witnesses' prior descriptions; (4) the witnesses' level of certainty; and (5) the length of time between the first view of the criminal and the subsequent identification. Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).
 
 
 52
 Hamilton, 684 F.2d at 383; see also United States v. Causey, 834 F.2d 1277, 1285 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988).
 
 
 53
 The district court applied the proper standard and found that Gilliam's in-court identification was reliable and independent of the photo array. The district court noted that the photo array was shown to the witness only once, three weeks after the drug raid, and that two months passed between the photo array identification and the subsequent in-court identification. In addition, the district court made the following specific findings:
 
 
 54
 Focusing then on the circumstances surrounding his observation and identification of Mr. Dozier on the night in question, the Court notes that the evidence indicates that the lighting was good, there was lighting coming from the kitchen, there was lighting coming from the hallway. The evidence shows that Mr. Gilliam had the opportunity and did, in fact, observe Mr. Dozier at very close proximity, he emphasized the closeness, estimated the distance as only ten inches or so. He said that he looked right at him. He had the opportunity to conduct this kind of a close observation of his facial features for up to 30 seconds. He said: I stood right up close and looked right at him. He was able to give a good, accurate physical description of Mr. Dozier immediately after the controlled purchase. He was able to see Mr. Dozier's physical features and appearance and based his identification according to his testimony on the way he looked, not on the color of the garment that he was wearing. When cross-examined about his in-court identification, he very clearly and emphatically testified that he was able to identify Mr. Dozier on the basis of his appearance in the courtroom and on the basis of his physical appearance on the night of the controlled purchase without any influence by the photographic array that he was shown....
 
 
 55
 (App. 219-20).
 
 
 56
 The district court's factual findings are not clearly erroneous. Further, under the totality of the circumstances, we find no due process violation in admitting the in-court eyewitness identification. The short length of time between Gilliam's controlled buy and the use of the photo array enhance the reliability of the photo array identification, while the longer period of time between the photo array identification and the in-court identification reduce the chance that suggestive elements in the photo array induced the in-court identification. Further, both photo identifications and subsequent in-court identifications have been held sufficiently reliable to be admissible, even where the photo identification involved suggestive procedures, if the circumstances surrounding the witness' observations and identification provide sufficient indicia of reliability. Hamilton, 684 F.2d at 383; Causey, 834 F.2d at 1285. The circumstances surrounding Gilliam's observations and identification meet this test.
 
 IV.
 
 57
 Defendants argue that the district court erred when it gave a curative instruction to the jury to disregard the testimony concerning the unsubstantiated crack sales, contending that the court instead should have declared a mistrial. The substance of the testimony was that, on May 15, 1990, an informant made two crack cocaine purchases from the apartment building at 1140 Oak Street. Yet, because there was no evidence that these purchases were made at apartment 1, the district court instructed the jury to disregard the testimony. Defendants maintain that the curative instruction of the district court could not have remedied the prejudicial effect of the testimony.
 
 
 58
 Before granting a mistrial, the court should always consider whether the giving of a curative instruction or some less drastic alternative is appropriate. United States v. Martin, 756 F.2d 323, 328 (4th Cir.1985). A trial judge has broad discretion in determining when a cautionary instruction, as opposed to a mistrial, can prevent any possible prejudice. United States v. Mealy, 851 F.2d 890, 902 (7th Cir.1988). Such instructions can be sufficient to avoid the possibility of unfair prejudice, and it is generally presumed that jurors have followed a cautionary instruction. Id. at 903. In the instant case, we find the district court's instructions to the jury sufficient to cure any prejudicial effect. Further, given the other evidence establishing drug transactions at Smith's apartment, we do not see how this particular evidence--that an informant had made a crack purchase from 1140 Oak Street on May 15, 1990--could have been prejudicial. We find no error in the district court's refusal to declare a mistrial.
 
 V.
 A.
 
 59
 Defendants' first argument challenging their sentences pertains to the district court's refusal to award a sentence reduction for acceptance of responsibility. Section 3E1.1 of the Federal Sentencing Guidelines (the guidelines) provides that if a defendant "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct," the offense level should be reduced by two levels. Dozier and Smith argue that they accepted responsibility for their crimes and that the district court erred by refusing to reduce their sentences accordingly.
 
 
 60
 The burden is upon the defendant to demonstrate acceptance of responsibility. United States v. Christoph, 904 F.2d 1036, 1040 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 713 (1991). The trial judge is in the best position to evaluate a defendant's attempt to accept responsibility. Accordingly, the sentencing judge's determination is entitled to great deference on review and should be sustained unless it is clearly without foundation. 18 U.S.C. § 3742(e); United States v. Wilson, 878 F.2d 921, 923 (6th Cir.1989).
 
 
 61
 The presentence report indicates that, after conviction, Smith continued to deny that he was part of a conspiracy to maintain a residence for the distribution of narcotic substances and continued to maintain that he was not aware that any drugs were being distributed from his residence. The district court relied upon Smith's denials, which were contrary to the findings of the jury, in order to find that Smith had not fully accepted responsibility for his participation in the actions for which defendant was convicted. The record supports the district court, and we find no clear error.
 
 
 62
 We also find defendant Dozier's contention that he demonstrated acceptance of responsibility to be without merit. As evidence of admission and contriteness, Dozier merely points to his statement at the conclusion of the sentencing hearing telling the sentencing judge that "all I want to say is that I try." We find no error in the district court's refusal to award a sentence reduction where the defendant seeks to establish an acceptance of responsibility based solely on such a statement. In seeking to establish facts that would lead to a sentence reduction, Dozier failed to meet his burden of proving facts by a "preponderance of the evidence." United States v. Rodriguez, 896 F.2d 1031, 1032 (6th Cir.1990).
 
 
 63
 Smith and Dozier both argue that it is unconstitutional for the trial court to require an acceptance of responsibility, when that requirement would interfere with their right to appeal their convictions and to maintain their innocence pending the outcome of their appeals. This argument is foreclosed by our ruling in United States v. Monsour, 893 F.2d 126, 129 (6th Cir.1990), where we stated that the application of section 3E1.1 of the guidelines creates "no impediment to a defendant's right to appeal, which remains unfettered whether he displays remorse or not." Although it might be different if a defendant had his sentenced enhanced for not accepting responsibility, that is not the case here, and the courts may legitimately consider remorse as a factor allowing leniency if remorse is forthcoming. Id. See also United States v. Thomas, 870 F.2d 174, 174-77 (5th Cir.1989).
 
 B.
 
 64
 The district court determined that Dozier and Smith merited a two level enhancement of their sentences for the possession of firearms pursuant to section 2D1.1(b)(1) of the guidelines. That section of the guidelines directs that a two level enhancement is given if a firearm was possessed during the commission of the offense. Defendants object to the inclusion of the firearms recovered at the time of the raid as a specific offense characteristic because of the lack of proof of the firearms' operability at the time of trial. Although the defendant bears the burden of proof to establish facts that would reduce a sentence, the government bears the burden of proof to establish facts that would enhance a sentence, and the level of proof is by a preponderance of the evidence for contested facts. Rodriguez, 896 F.2d at 1032. However, as with the guideline determination for acceptance of responsibility already discussed, our review of findings of fact with regard to guideline determinations is governed by the clearly erroneous standard. 18 U.S.C. § 3742(e); Wilson, 878 F.2d at 923.
 
 
 65
 As indicated by trial testimony, two semi-automatic pistols were discovered and seized inside Smith's residence at the time of the execution of the search warrant. Gilliam, the participant-informant, also testified that Dozier carried a firearm during a drug transaction between Dozier and Gilliam. Although proof of the firearms' operability was not introduced at the time of trial, subsequent to the trial, the firearms were tested and found to be operable, and a report verifying the operability of the firearms was submitted to the district court and disclosed to the defendants prior to the sentencing hearing. Assuming, arguendo, that proof of the firearms' operability is necessary for purposes of sentencing, the fact that evidence of operability was not admitted at trial does not preclude the use of such evidence during sentencing. "[A] sentencing judge has broad discretion to hear a variety of evidence," even evidence not admissible during trial. Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 344 (1989). Defendants do not contend that the information establishing the presence of firearms during the commission of their offenses is false or unreliable. The district court's finding that defendants possessed firearms is not clearly erroneous, and we find no error in the enhancement of their sentences pursuant to section 2D1.1(b)(1) of the guidelines.
 
 C.
 
 66
 Finally, Smith objects to the district court's refusal to grant more than a two point reduction based on the degree of his participation in the criminal activity. Section 3B1.2 of the guidelines, titled "Mitigating Role," states as follows:
 
 
 67
 Based on the defendant's role in the offense, decrease the offense level as follows:
 
 
 68
 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
 
 
 69
 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
 
 
 70
 In cases falling between (a) and (b), decrease by 3 levels.
 
 
 71
 At the sentencing hearing, Smith argued that he was entitled to a four level decrease for being a minimal participant, or, in the alternative, that he should be granted a three level decrease for being between a minimal and minor participant. In response to Smith's argument, the district court found that Smith
 
 
 72
 was a part of this drug conspiracy and that he did knowingly and intentionally provide his residence as the location for this very active crack house, this very active operation of selling crack cocaine, and doing so constitutes even more than a minimal participant, so the Court will deny that objection.
 
 
 73
 (App. 232).
 
 
 74
 The first note in the commentary accompanying section 3B1.2 of the guidelines states that "defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." The district court's factual findings pertaining to Smith's awareness and involvement are supported by the jury verdict. We find no error in the sentencing court's conclusion that Smith's conduct constituted more than minimal participation.
 
 
 75
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Thomas G. Hull, United States District Court, Eastern District of Tennessee, sitting by designation
 
 
 [1]
 The federal "knock-and-announce" statute is a codification of traditional Anglo-American rules embodying "fundamental values." Sabbath v. United States, 391 U.S. 585, 589 (1968). The statute reads:
 The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.
 18 U.S.C. § 3109.
 
 
 [2]
 The pertinent part of the Ohio statute, effective at the time of the search, reads as follows:
 When making an arrest or executing a warrant for the arrest of a person charged with an offense, or a search warrant, the officer making the arrest may break down an outer or inner door or window of a dwelling house or other building, if, after notice of his intention to make such arrest or such search, he is refused admittance, but an officer executing a search warrant shall not enter a house or building not described in the warrant.
 Ohio Rev.Code § 2935.12.
 
 
 [3]
 Although we decline to create a full exception to the knock and announce rule for entrances to the common areas of multiple residence buildings, there is merit to the argument that the degree of exigency required to justify entry without full adherence to the rule is less for common areas than for individual apartments. "Whether the exigency is sufficient to justify the officers' challenged behavior turns upon the extent and nature of the departure that must be justified." United States v. Bonner, 874 F.2d 822, 826 (D.C.Cir.1989). In this case, the departure from the rule occurred at the entrance to the common area of the apartment building where, although the expectation of privacy exists, the interest in preventing violence to police or occupants and the occupants' interest in privacy are implicated to a lesser degree than if the departure from the rule occurs at the individual apartment door
 
 
 [4]
 While it might appear anomalous for the police to depart from the knock and announce rule at an outer doorway to a multi-unit residence and then proceed to knock and announce their presence at an individual apartment door, the time factor involved at each location militates against such a conclusion. In some multiple residences, it may reasonably take residents longer to respond to police presence and authority announced at an outside door than at an inside door, and the exigencies of an urgent situation are often exacerbated as time lapses. Consequently, it is not necessarily inconsistent, as defendants suggest, for exigent circumstances to justify a departure from the rule at one point of entry, even though the officers executing the warrant choose to knock and announce at another point of entry. Both the efficacy of the knock and announce rule and the exigency of the moment can vary in degree at different points in the process of executing a search warrant
 
 
 [5]
 The Supreme Court in Roviaro declined to establish a fixed rule with respect to disclosure of an informant's identity
 Instead, it indicated that the "problem is one that calls for the balancing of the public interest in protecting the flow of information against the individual's right to prepare his defense." It further stated that "whether a proper balance renders non-disclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."
 Whitley, 734 F.2d at 1138 (citations omitted).
 
 
 [6]
 In addition to accusing the government of suppressing exculpatory evidence and then conducting a "trial by ambush" in violation of the Brady rule, defendants also accuse the government of failing to comply with a discovery request in violation of Federal Rule of Criminal Procedure 16. However, assuming Rule 16 applies, we are still required, as with the Brady rule, to determine the extent to which the defendants have been prejudiced by the failure to disclose. See United States v. D'Antoni, 856 F.2d 975, 984-85 (7th Cir.1988). Further, defendants must move for a continuance upon learning of the government's failure to comply with a Rule 16 request in order to preserve the issue of prejudice on appeal. See United States v. Glover, 846 F.2d 339, 842 (6th Cir.), cert. denied, 488 U.S. 982 (1988). In the instant case, neither defendant moved for a continuance